UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-----------------------------X

PAUL DE Nicola, ENZA DE NICOLA
and MARY RENDEIRO,

       Plaintiffs,

   -against-

ADELPHI ACADEMY,

       Defendant.

-----------------------------X

<u>MEMORANDUM AND ORDER</u>

Civil Action No.
CV-05-4231

TRAGER, J.

    This action involves claims pertaining to the termination of
three employees by their employer.  Plaintiffs, Paul De Nicola
("Paul"), Enza De Nicola ("Enza") and Mary Rendeiro,
(collectively "plaintiffs"), filed a complaint against their
former employer, Adelphi Academy ("Adelphi," the "Academy" or
"defendant"), under, inter alia, the Consolidated Omnibus Budget
Reconciliation Act ("COBRA") and 29 U.S.C. § 1161 et seq., a
federal statute which requires employers to provide employees
with notice of their right to continued health care coverage
after certain "qualifying events."  Compl. ¶ 2. <u>See</u>, 29 U.S.C.
§ 1161.  Plaintiffs have moved for summary judgment on this
claim.  Mem. of Law in Supp. of Pls.' Mot. for Partial Summ. J.
and Opp. to Def.'s Mot. Dismiss ("Pls.' Mot. for Partial Summ.
J.") at 1.  While defendant does not oppose the summary judgment

motion insofar as it "seeks judgment on liability . . ." it does oppose the plaintiffs' accompanying request for statutory damages and an award of attorneys' fees and costs.  Mem. of Law in Partial Opp. to Pls.' Cross-Mot. for Partial Summ. J. Reply ("Opp. to Pls.' Cross-Mot. for Partial Summ. J.") at 4.

Additionally, plaintiffs assert three state law claims, specifically, (1) breach of contract, (2) conversion of property belonging to the plaintiffs, and (3) defamation.  Compl. ¶ 2. Defendant moves to dismiss these claims for lack of jurisdiction, arguing that the federal COBRA claim is moot and that the court should not exercise jurisdiction over the remaining state law claims.  Mem. of Law in Supp. of Def.'s Mot. to Dismiss ("Mot. to Dismiss") at 1-2.

For the reasons set forth below, summary judgment is granted on the COBRA claim.  Plaintiffs are not awarded attorneys' fees or statutory damages and are given 30 days to submit itemized medical bills to determine the amount, if any, of medical reimbursements that are appropriate.  Additionally, because the only federal claim has been disposed of, supplemental jurisdiction over the three remaining state law claims will not be retained.

**Background**

The facts pertinent to the current motions are drawn from

2

plaintiffs' complaint and the parties' respective statements pursuant to Local Civil Rule 56.1. Unless otherwise indicated, the facts are not in dispute.

## (1)

### The Parties

Adelphi is a nonprofit, private school located in Brooklyn, New York, and chartered by the New York State Board of Regents. Pls.' Joint Statement of Material Facts Pursuant Local Civ. R. 56.1 ("Pls.' 56.1 Stmt.") ¶ 7. Plaintiffs describe Adelphi as managed by a Board of Trustees ("Board"). Compl. ¶ 9. Plaintiffs' discord with defendant centers on their sour relationship with Albert Corhan ("Corhan"). Corhan and his family have a long history of serving the Adelphi Board. Both his mother, Dolores Corhan, and sister, Suzanne Corhan, served on the Board and from approximately 1998 through June 2004, Suzanne Corhan served as the Board's President. Id. Corhan has been employed by Adelphi since approximately 1999.[1] Pls.' 56.1 Stmt. ¶ 8. First, Corhan served as the Board's Alumni representative. Id. From 2000 through June 2003, Corhan was employed as the Director of Academy Advancement at Adelphi. Id. Finally, from

---

[1]The exact dates of employment and titles of positions held by Corhan, Mary Rendiero, Paul and Enza are disputed by defendant. Def.'s Response to Pls.' 56.1 Stmt. ("Def.'s 56.1 Stmt.") ¶¶ 1-8.

September 2003 to the present Corhan has been employed as the Director of the Academy.  Id.

From 1998-99, Paul De Nicola was employed by Adelphi as a teacher of both History and English.  Pls.' 56.1 Stmt. ¶ 1.  He was again employed by Adelphi in 2003-04 as the Dean of Academics and the Head of the Upper School.  Id.  Plaintiffs allege that on November 11, 2004, De Nicola entered into an employment contract for the period of July 1, 2004 through June 30, 2006, as the Dean of the Academy and as Adelphi's Chief Executive Officer.  Id.  In August 2002, Mary Rendeiro was hired by Adelphi as Main Office Manager.  Id. ¶ 5. Enza De Nicola, Paul's wife, began working as Finance Manager at Adelphi on July 21, 2004.  Id. ¶ 3.  Her contract ran through July 31, 2005.  Id. ¶ 4.


**(2)**

**Plaintiffs' Termination**

Prior to their termination, plaintiffs accused Corhan of being involved in a number of financial improprieties.  Compl. ¶ 12.  Among the accusations was Corhan's alleged use of Adelphi credit cards to charge personal expenses, failing to make deductions from his own salary for contributions Adelphi made to his TIAA-CREF Retirement account, creating a little- or no-show job for his then-fiancee, Della Ann Sarno, and failing to submit reports to the IRS for two years.  Id.  Plaintiffs also alleged

that Corhan created both checking and savings accounts in the
name of the "Academy Alumni Association" and used at least one of
those accounts to receive more than $50,000 in grant and mandated
services money from the State of New York.  Id.  Plaintiffs state
that Corhan also used these accounts to make campaign
contributions to the Conservative Party of New York State and to
various Brooklyn politicians.  Id.  According to plaintiffs,
Corhan concealed his improprieties by stipulating that he was the
sole Adelphi employee permitted to handle the Academy's mail or
authorize bank deposits.  Id. ¶ 13.  Plaintiffs allege that the
latter policy resulted in large amounts of cash being left
unsecured at Adelphi: ultimately $10,000 was discovered missing
in April 2005.  Id.

Plaintiffs maintain that on June 1, 2005, Paul confronted
Corhan about the alleged improprieties.  Compl. ¶ 14.  On the
same day, after Corhan allegedly admitted that he needed to
rectify the situation, plaintiffs claim that Corhan transferred
approximately $50,766.00 from an Alumni Association account to an
Adelphi school operations account.  Id.  Paul also alleges that
he discussed the improprieties with Arthur Maresca, Chairman of
the Board, and other Board members, who charged Paul with
discovering more specifics about Corhan's activities.  Id. ¶ 15.
According to plaintiffs, Paul was to report his findings to
Maresca at noon on June 22, 2005.  Id.

Plaintiffs claim that Corhan did not remedy the situation beyond the bank transfers. Compl. ¶ 16. Rather, on June 14, 2004, he attempted to further conceal his actions by demanding that Mary Rendeiro pledge allegiance to him. Id. ¶ 17. She refused. Id.

On the morning of June 22, 2005, plaintiffs were given termination letters from Marasca. Pls.' 56.1 Stmt. ¶ 17; Compl. Ex. B. According to plaintiffs, Paul De Nicola was terminated for "conduct and actions . . . found to be at odds with the needs of the Academy." Compl. ¶ 19. Enza was terminated for "fail[ing] to safeguard monies entrusted" to her. Compl. ¶ 20. The money referred to in the termination letter allegedly went missing in April 2005. Compl. ¶ 20. Plaintiffs point out that Enza was not terminated until two months later, in late June. Id. Mary was terminated for unsatisfactory conduct and work habits. Id. ¶ 21. Plaintiffs note that the previous February Mary Rendeiro was named employee of the year. Pls.' 56.1 Stmt. ¶ 6. All of the termination letters reminded plaintiffs of the confidentiality agreement found in their respective employment contracts. Compl. ¶ 22. Plaintiffs allege that they were escorted out of the school by armed guards and were prohibited from taking any of their personal belongings with them. Pls.' 56.1 Stmt. ¶ 17; Comp. Ex. H. Plaintiffs also maintain that they have no prior disciplinary records with Adelphi. Id. ¶ 18.

Adelphi, however, denies this statement.  Def.'s 56.1 Stmt. ¶ 18.

On June 28, 2005, plaintiffs wrote the Board of Trustees again reminding them of Corhan's alleged improprieties and requesting to be reinstated.  Compl. ¶ 23.  On July 6, 2005, the Board responded in a letter from their attorney, who accused plaintiffs of making baseless accusations. Compl. ¶ 24. Plaintiffs allege that Adelphi never investigated Corhan's activities at the Academy.  Id. ¶ 25.


### (3)

### COBRA

Adelphi offers health benefits to all employees.  Pls.' 56.1 Stmt. ¶ 19.  Plaintiffs' health care benefits were cut off sometime after their termination.  Id. ¶ 20.  In a letter dated July 20, 2005, plaintiffs requested that they receive COBRA notification forms.  Pls.' 56.1 Stmt. ¶ 21; Compl. Ex. E.  In letters dated August 1, 2005, from Maresca, plaintiffs were informed that they were ineligible for COBRA benefits because their termination was due to their own "gross misconduct."  Pls.' 56.1 Stmt. ¶ 22; Compl. Ex. F.  Adelphi also took the position that plaintiffs were not eligible for unemployment benefits from the New York State Department of Labor because for the same reason.  Compl. ¶ 29.  Plaintiffs, however, maintain that the New York State Department of Labor, Bureau of Insurance, determined

that they were not terminated for "gross misconduct" and, therefore, were entitled to benefits. Id. It is important to note that COBRA simply requires that employers notify outgoing employees of their right to elect COBRA coverage; it does not obligate employers to pay premiums for any coverage that an employee elects. See Local 217, Hotel & Restaurant Emp. Union v. MHM, Inc., 976 F.2d 805, 809 (2d Cir. 1992); Lafauci v. St. John's Riverside Hosp., 381 F. Supp. 2d 329, 332 (S.D.N.Y. 2005). Rather, departing employees must pay their own premiums. See Local 217, Hotel & Restaurant Emp. Union v. MHM, Inc., 976 F.2d 805, 809 (2d Cir. 1992); Lafauci v. St. John's Riverside Hosp., 381 F. Supp. 2d 329, 332 (S.D.N.Y. 2005).

According to plaintiffs, for six months after their termination, they had no available health insurance and as a result were forced to forgo medical treatment for a wide variety of new and pre-existing conditions. Id. ¶¶ 27-30. Paul states that during the six months following his termination he was unable to obtain medical treatment for his chronic sleep apnea, for a chronic eye problem which required a retinal specialist, for a serious dental problem nor for various regular checkups with his physician, dentist and opthamologist. Id. ¶ 28. Similarly, Enza alleges that she was unable to see a specialist for regular semiannual visits to monitor a pre-existing gynecological condition and for her migraine headaches, for which

she was also unable to obtain medication.  Id. ¶ 30.  Enza also alleges that she could not receive treatment for the flu and was unable to maintain her regular visits with her physician, dentist and opthamologist.  Id.  Additionally, plaintiffs maintain that Mary Rendeiro was unable to receive treatment for hip and back problems which left her immobilized for approximately four weeks in September and October 2005.  Id. ¶ 29.  She also claims that she was unable to obtain treatment for a severe chest cold and suffered extreme stress and anxiety due to worry over her lack of medical insurance.  Id.  Defendants, however, note that both Paul and Enza De Nicola filed medical claims once their insurance was reinstated and thus must have received some medical treatment during the time in question.  Def.'s 56.1 Stmt. ¶¶ 28, 30.

## (4)

## The Present Action

On September 7, 2005, plaintiffs filed this action alleging four charges against Adelphi: (1) Under COBRA, plaintiffs maintain that termination for reasons other than "gross misconduct" is a "qualifying event," under 29 U.S.C. §§ 1161, 1162(2)(A)(I), which requires an employer to notify an employee of his or her right to elect to continue health coverage for eighteen months after termination.  Compl. ¶¶ 40-41.
(2) Plaintiffs also maintain a breach of contract action against

Adelphi, stating that they were terminated without "cause," which is required by the policies of the Trustees. Id. ¶¶ 46-50. (3) Additionally, plaintiffs bring a conversion action stating that they repeatedly requested that their personal belongings be returned to them, but that these requests were ignored by defendant. Id. ¶¶ 51-55. (4) Finally, plaintiffs allege that after their termination, Adelphi representatives made defamatory statements against them. Id. ¶¶ 56-57. As redress for their COBRA claim, plaintiffs seek statutory damages and penalties pursuant to 29 U.S.C. § 1132(c), attorneys' fees and costs, and injunctive relief directing Adelphi to provide plaintiffs with their COBRA notices and benefits. Id. ¶ 58.

Shortly after plaintiffs filed their complaint the parties entered mediation. Mot. to Dismiss at 3. After the complaint was filed, Adelphi provided COBRA notices to Paul De Nicola and Mary Rendeiro on November 25, 2005 and to Enza De Nicola on December 3, 2005. Compl. ¶¶ 24-25. Enza's health insurance was reinstated on December 12 and Mary and Paul's insurance was reinstated on December 29. Compl. ¶ 26. Paul De Nicola made a claim for $38 in retroactive payment and Enza De Nicola made a claim for less than $300 in retroactive payment. Pls.' 56.1 Stmt. ¶ 31. Mary Rendeiro made no such claims. Id.

According to defendant, on December 28, 2005, it paid five months' worth of health insurance premiums for each plaintiff,

amounting to $2,183.60, despite not being required to do so under COBRA. Def.'s 56.1 Stat. ¶ 18; Gutstein Aff. Ex. C. Jan. 20, 2006. Adelphi maintains that these actions did not reflect a change in its view of plaintiffs' termination, but rather its desire to expedite the process of resolution. Def.'s 56.1 Stmt. ¶ 24. At a court conference the following day, defendant "informed the Court that in an effort to resolve this matter, it would not seek to prove gross misconduct." Mot. to Dismiss at 7 n.4.

## (5)

### Acts of Intimidation

Mediation, however, was cut short by actions outside of, but related to, this litigation, as this bitter dispute devolved into further allegations of misconduct. Mot. to Dismiss at 4 n.2. As a backdrop to the current litigation, defendant has alleged that plaintiffs have waged a campaign of intimidation and harassment against the Academy and, specifically, Corhan. Def.'s 56.1 Stmt. ¶¶ 34-6. According to defendant, a group identifying itself as "The Wobblies" is responsible for various attacks against Corhan and the Academy.[2] Def.'s Mem. of Law at 2-3. Defendant claims

---

[2] The alleged harassment includes, (1) slashing the tires of Corhan's automobile; (2) discouraging the parents of Adelphi students from re-enrolling their children at the Academy and "threatening to bring the school down," see Zambrano Aff. 2-6, Dec. 22, 2005; Kadiu Aff. 1-2, Dec. 22, 2005; (3) providing confidential information about the Academy and defaming information about Corhan to the media, see, e.g., Def.'s Order to

that Corhan received a letter at his home from the "Wobblies,"
who claimed responsibility for the harassment against him.
Def.'s 56.1 Stmt. ¶ 35;  Order to Show Cause Aff. Ex. A.  Adelphi
also notes that the plaintiffs, as well as other former employees
of Adelphi, appear in a photograph captioned, "The Wobblies,"
which is posted on the America Online profile of Amy Kenny, Mary
Rendeiro's daughter.  Def.'s 56.1 Stmt. ¶ 36; Def.'s Mem. of Law
at 2 n.1; <u>see also</u>, Order to Show Cause Ex. B., C.  Defendant
states that "Wobblies," according to the Industrial Workers of
the World Website, means "sabotage."  Def.'s Mem. of Law at 2
n.1.

Although Adelphi remained in mediation through much of the
harassment campaign, once Corhan was physically attacked,
including being held at gunpoint by an unidentified attacker,
defendant discontinued mediation and moved forward with a motion
to dismiss.  <u>Id.</u> at 4 n.2.  Defendant moved for a preliminary
injunction and temporary restraining order against plaintiffs,
their representatives and the other members of "The Wobblies,"
from "harassing, intimidating, threatening, defaming and

---

Show Cause Ex. D); (4)inserting glue into the locks of Corhan's
home; (5) breaking into Corhan's car; (6) sending correspondences
to the New York State Board of Regents and the New York State
Attorney General's Office accusing Adelphi of various
improprieties; (7)attempting to damage Adelphi's attempts to
refinance the Academy; and (8) impersonating students to upload
negative comments about Adelphi on "Ratemyteacher.com," <u>see</u>
Def.'s Order to Show Cause Ex. E.; Def. Mem. of Law at 2-3.

badgering in any manner defendant, its employees, Board Members, the parents of its student body, and any other party or potential witness." Id. at 1. This court orally denied the preliminary injunction and temporary restraining order for lack of jurisdiction, and soon thereafter someone broke into Corhan's apartment building and wrote the words "Tell it to the Judge" in large letters on the wall. Plaintiffs have denied any involvement in the alleged harassment against Corhan and the Academy.

On February 27, 2006, plaintiffs moved for partial summary judgment on the COBRA claim and requested that the court exercise supplemental jurisdiction over the remaining three state law matters. Pls.' Mot. Partial Summ. J. at 1. Defendant opposes plaintiffs' application for attorney's fees and statutory damages on the grounds that plaintiffs "suffered no harm or prejudice caused by the brief delay in service of the respective COBRA notices," but does not oppose the motion for summary judgment on liability grounds. Def.'s Opp. to Pls.' Cross-Mot. for Partial Summ. J. at 2.

Defendant contends that this court should not exercise supplemental jurisdiction on the remaining claims for two reasons: first, the COBRA claim, which is the sole federal subject matter jurisdiction-conferring claim, will soon be disposed of by the court in the summary judgment motion. Id. at

13

15. Second, defendant contends that the remaining three claims are not related to the COBRA claim as required by 28 U.S.C.A. § 1367(a) and if the court were to exercise supplemental jurisdiction, the state claims would predominate over the federal subject matter jurisdiction-conferring claim.  <u>Id</u>. at 17.

## Discussion

## (1)

### Summary Judgment

Fed. R. Civ. P. 56(c) provides that summary judgment should be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); <u>see</u> <u>Celotex Corp v. Catrett</u>, 477 U.S. 317, 322-28 (1986).  The moving party bears the burden of showing that there is no genuine issue of material fact.  <u>Celotex</u>, 477 U.S. at 323.

In determining whether there is a genuine issue of fact to be tried the facts are construed in the light most favorable to the non-moving party and "resolve all ambiguities and draw all reasonable inferences against the moving party." <u>Flanigan v. Gen. Elec. Co.</u>, 242 F.3d 78, 83 (2d Cir. 2001) (citing <u>Matsushita</u>

14

Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587
(1986)). If the evidence in the record would allow a reasonable
jury to return a verdict for the non-moving party, a genuine
issue of material fact exists. Anderson v. Liberty Lobby, Inc.,
447 U.S. 242, 248 (1986). The non-moving party must then "set
forth specific facts showing there is a genuine issue for trial."
Fed. R. Civ. P. 56(e); Harlan Assoc. v. Incorporated Village of
Mineola, 273 F.3d 494, 499 (2d Cir. 2001)

COBRA is a "legislative response to the growing number of
Americans without health insurance and the reluctance of
hospitals to treat the uninsured." Phillips v. Saratoga Harness
Racing, Inc., 240 F.3d 174, 179 (2d Cir. 2001) (citing Gaskell v.
Harvard Coop. Soc'y, 3 F.3d 495, 498 (1st Cir. 1993)). The
Second Circuit describes the goal of COBRA as providing an
alternative to the "prohibitively expensive individual health
care insurance policies" for those "at risk of losing their
employment-related group health insurance." Id. at 177. Under
COBRA, "the plan sponsor of each group health plan shall provide
. . . that each qualified beneficiary who would lose coverage
under the plan as a result of a qualifying event is entitled,
under the plan, to elect, within the election period,
continuation coverage under the plan." 29 U.S.C. § 1161(a).
Within 14 days of a qualifying event an employer must notify an
employee of his or her right to elect to continue health coverage

for a period of eighteen months.  29 U.S.C. §§ 1166(a)(4)(A),(c);

29 U.S.C. §§ 1161, 1162(2)(A)(I) (1999).  Termination of

employment is a qualifying event so long as the termination was

not due to the former employee's gross misconduct.  29 U.S.C.

§§ 1163(2).

In support of their motion for summary judgment on their

COBRA claim, plaintiffs point to the undisputed facts, stating:

> In this case, it is not . . . disputed that (1)
> defendant maintained a health insurance plan for its
> employees; (2) that plaintiffs, when employed by
> defendant, were participants in that plan; (3) that
> defendant was the plan administrator for the health
> plan it maintained for its employees; (4) plaintiffs
> were not given their COBRA election notices in the 14
> days required by statute; . . . [and (5)] defendant
> did not send Paul De Nicola and Mary Rendiero their
> COBRA election notices until November 23, 2005 and
> Enza De Nicola until November 30, 2005.

Pls.' Mot. for Partial Summ. J. at 9-10.

Plaintiffs also support their motion by stating that they

were not terminated for "gross misconduct."  Id. at 9.  Adelphi's

failure to initially provide plaintiffs with COBRA notices may

have been validated on a showing of defendant's good faith belief

that the plaintiffs were terminated because of their own "gross

misconduct."[3]  However, while defendant has not wavered in its

_____

[3] The term "gross misconduct" is not statutorily defined.
Lloynd v. Hanover Foods Corp., 72 F. Supp. 2d 469, 478 (D. Del.
1999).  One court has held that a reasonable fact-finder could
conclude that behavior such as "violating the terms of his
administrative leave,. . . assaulting a co-worker, [and] sending

16

assertion that plaintiffs were terminated for their own "gross misconduct," it has chosen not to put forward any specific facts to dispute plaintiffs' summary judgment motion.[4]  Since defendant admits to having failed to send plaintiffs their COBRA notices and chooses not to litigate the issue of the plaintiffs' "gross misconduct" as grounds for their termination, there is no issue to be decided.  Accordingly, plaintiffs' motion for summary judgment on liability is granted.

## (2)

### Statutory penalties

Plaintiffs seek remedy in the form statutory penalties under U.S.C. § 1132(c)(1), reimbursed medical expenses and attorneys' fees under 29 U.S.C. § 1132(g).  Each will be taken in turn.

---

and receiving pornographic material via the internet from his office computer" constitutes gross misconduct.  <u>Deutsch v. Kroll Assocs., Inc.</u>, No. 02 CV 2892, 2003 WL 22203740, at *6 (S.D.N.Y Sept. 23, 2003).

[4] If defendant were to contest the issue of gross misconduct, the court would have to look at many questions relatively unanswered in this circuit, including whether the employer must have a good faith belief that the employee engaged in conduct which could be characterized as "gross" or whether such misconduct must have actually occurred.  The Seventh Circuit has held that an "employer's belief that the employee engaged in gross misconduct must be more than an honest, actual belief .. . rather, the record must reveal that the employee did indeed engage in the gross misconduct."  <u>Karoitis v. Navistar Int'l Transp. Corp.</u>, 131 F.3d 672, 680 (7th Cir. 1997).

### a. Statutory penalties and reimbursement for medical expenses

ERISA provides that

> any administrator (A) who fails to meet the
> requirements of paragraph (1) or (4) of section 1166
> of this title . . . with respect to a participant or
> beneficiary . . . may in the court's discretion be
> personally liable to such      participant or
> beneficiary in the amount of up to $100 a day from the
> date of such failure . . . , and the court may in its
> discretion order such other relief as it deems proper.

29 U.S.C. § 1132(c)(1).

Penalties under ERISA were increased to $110 per day pursuant to the Federal Civil Penalties Adjustment Act of 1990, as amended by the Debt Collection Improvement Act of 1996.  See 29 C.F.R. 2575.502c-1.

Both the decision to award penalties and the amount of any award are within the discretion of the trial court.  See 29 U.S.C. § 1132(c)(1).  Courts have differed in their views of whether a statutory award is purely a penalty or whether compensation to the plaintiff should be taken into account.  See O'Shea v. Childtime Childcare, Inc., No. 01 CV 1264, 2002 WL 31738936, at *7 (N.D.N.Y Dec. 2, 2002) (citing Chestnut v. Montgomery, 307 F.3d 698, 704 (8th Cir. 2002)) (stating that the purposes of an award under COBRA "are both deterrence and compensation"); see also Lloynd v. Hanover Foods Corp., 72 F. Supp. 2d 469, 478 (D. Del. 1999) ("The purpose of ERISA's penalty provision is to induce compliance with

satisfactory notification requirements and to punish non-compliance.").

In O'Shea, a former daycare employee was terminated and her employer failed to provide her with COBRA notice.  She was diagnosed with and treated three times for a gastrointestinal disorder after her coverage was terminated.  O'Shea, 2002 WL 31738936, at *7.  The court found that this prejudiced the plaintiff and, in conjunction with the interest in deterring employers from failing to give notice, pointed toward an award of statutory damages.  Id.  The court awarded O'Shea $50 a day for the period between the first day after the defendants' time for giving notice had lapsed and the last day that O'Shea was without coverage before starting a health plan at her new job.  Id.

Conversely, in Partridge v. HIP of Greater New York, No. 97 CV 0453, 2000 WL 827299 (S.D.N.Y. June 26, 2000), since the plaintiff was immediately covered by the health plan at her new job and incurred no medical bills or charges, the court found that plaintiff "suffered no prejudice from the alleged failure of notice" and, therefore, "cannot recover damages." Partridge, 2000 WL 827299, at *6.  Similarly, in Gigliotti v. Sprint Spectrum, No. 00 CV 217, 2001 WL 1717305 (N.D.N.Y. Dec. 7, 2001), relied on by defendant, the court found that with the plaintiff's "subsequent election of coverage for the full eighteen-month period, and Defendant's retroactive application of coverage to

February 1, 1999, . . . the discretionary award of damages, in
the form of civil penalty is unwarranted." Gigliotti, 2001 WL
1717305, at *6.  The court went on to ask plaintiffs to submit
"any and all itemized medical bills and other expenses, including
off-setting reimbursements, for the purposes of calculating
appropriate damages."  Id.  In Rinaldo v. Grand Union Company,
No. 89 CV 3850, 1995 WL 116418, at *2 (E.D.N.Y. Mar. 8, 1995),
the plaintiff was awarded no damages after his employer failed to
give him his COBRA notice because the cost of the premium
payments plaintiff would have to pay to be eligible to receive
reimbursement for his medical bills would "far exceed" the
medical bills plaintiff incurred.  Rinaldo, 1995 WL 116418, at
*2.

        In awarding statutory damages in ERISA actions for a failure
of an employer to produce requested documents, factors such as
"bad faith or intentional conduct on the part of the
administrator, the length of the delay, the number of requests
made and documents withheld, and the existence of any prejudice
to the participant or beneficiary" are influential.  Devlin v.
Empire Blue Cross Blue Shield, 274 F.3d 76, 90 (2d Cir. 2001)
(quoting Pagovich v. Moskiwitz, 865 F. Supp. 130, 137 (S.D.N.Y.
1994)); see also, Strom v. Siegel Fenchel & Peddy P.C. Profit
Sharing Plan, No. 03 CV 1317, 2005 WL 2436212, at *18 (E.D.N.Y.
Sept. 30, 2005).

Plaintiffs argue that they are entitled to receive statutory penalties regardless of defendant's bad faith or the amount of harm suffered. Pls.' Mot. for Partial Summ. J. at 8-10. First, relying on the language of §§ 1166 and 1132(c)(1), plaintiffs state that the only requirement is that one "simply" show that the was a "'failure or refusal' on the part of the administrator to provide the required notice" and that defendant has admitted to this failure. Pls' Motion. in Supp. of Summ. J. at 9 (quoting 29 U.S.C. § 1132(c)(1)). Plaintiffs rely on <u>Underwood v. Fluor Daniel, Inc.</u>, 106 F.3d 394 (Table), No. 95-3036, 1997 WL 33123, at *4 (4th Cir. 1997), which states

> there is no statutory requirement that the plaintiff
> in an action against a plan administrator for failure
> to provide a coverage election notice must
> demonstrate that the administrator acted in bad
> faith, that the failure or refusal was prejudicial,
> or that the plaintiff was harmed.

Pls' Mot. for Partial Summ. J. at 9 (quoting <u>Underwood</u>, 1997 WL 33123, at *4). As defendant points out, however, plaintiffs' reliance on <u>Underwood</u> is unavailing since Fourth Circuit law is not binding here, and furthermore, because it is an unpublished opinion whose citation is "disfavored" even within the Fourth Circuit. Opp. to Pls.' Cross-Mot. for Summ. J. at 6; 4th Cir. R 36(c) (citation of unpublished 4th Cir. opinions).

Second, plaintiffs state that the discretionary damages available under 502(c)(1) should be granted "because the

defendant acted in bad faith and plaintiffs were prejudiced."
Pls.' Mot. for Summ. J. at 10. Plaintiffs attempt to distinguish
Gigliotti and Partridge from their own case by stating that the
employer in those cases did not engage in bad faith conduct,
while Adelphi did engage in such conduct. Id. at 13. As
evidence of bad faith, the plaintiffs claim that they were
terminated solely in order to conceal the alleged financial
improprieties of Corhan. Id. at 10. Plaintiffs also emphasize
that defendant's assertion that they were terminated for "gross
misconduct" was rejected by New York State Department of Labor,
Bureau of Insurance. Id. at 11. Plaintiffs allege that the
belated compliance by defendant and their eventual receipt of
their COBRA notices was not a "good faith effort to reach
settlement in this case . . . but . . . a cynical effort to avoid
liability in this case and frustrate plaintiffs' efforts to have
this matter decided in one forum." Id. at 12.

Despite these assertions, a number of courts have opted to
forgo awarding statutory damages unless there has been a bad
faith action by the defendant resulting in severe prejudice to
the plaintiff. See, Gigliotti, 2001 WL 1717305, at *6 (N.D.N.Y.
2001); Gonzales v. Lambert, 339 F. Supp. 2d 351, 358 (D.P.R.
2004) (citing Rodriquez-Abreu v. Chase Manhattan Bank, N.A., 986
F.2d. 580, 588-89 (1st Cir. 1993); Bartling v. Fruehauf Corp., 29
F.3d 1062, 1068 (6th Cir. 1994)); Brooks v. North American

Philips, 142 F. Supp. 2d 407, 413 (W.D.N.Y. 2001).  While plaintiffs cite a litany of medical problems – such as sleep apnea, an eye problem, a dental problem, migraine headaches, the flu, and hip and back problems – for which they were unable to receive treatment during the six months before they received their notices, they were all, similar to the plaintiff in Gigliotti, eventually restored their medical coverage for the period of time during which they were waiting to receive their COBRA notices.  Opp. to Pls.' Cross-Mot. for Summ. J. at 5.  On the face of it, the cost of treatment for these complaints would not have come close to the cost of the insurance premiums for which plaintiffs would have been responsible.  Furthermore, the fact that both Enza and Paul De Nicola filed medical claims once their insurance was reinstated demonstrates that they did receive some medical care during the period they were waiting for their notices.

Additionally, defendant's payment of five months' worth of retroactive insurance premiums not only demonstrates defendant's good faith, but also puts plaintiffs in a better position than they would have been in had they received the notices initially. Premium payments can be quite high, in this case amounting to $2,183.60 that plaintiffs would have had to pay themselves if they were to have insurance during the period they were waiting for their notices, far exceeding the approximately $300 and $38

in medical expenses that Enza and Paul De Nicola incurred while they were without coverage. Pls.' 56.1 Stmt. ¶ 31. Additionally, given that the plaintiffs were able to receive some medical treatment, as evidenced by the retroactive insurance claims, it would seem that the treatment they forewent must not have been vital and probably has not been severely compromised by the six-month delay. See Opp. to Pls.' Cross-Mot. for Summ. J. at 7. However, in response to the ailments for which the plaintiffs allege they were unable to receive treatment, the court will allow plaintiffs to submit "any and all itemized medical bills and other expenses, including off-setting reimbursements, for the purposes of calculating appropriate damages." Gigliotti, 2001 WL 1717305, at *6.


**b. Attorney's Fees and Costs**

29 U.S.C. § 1132(g)(1) allows a court in its discretion to award attorneys' fees "to either party" in an ERISA action. 29 U.S.C. § 1132(g)(1); Salovaara v. Eckert, 222 F.3d 19, 27 (2d Cir. 2000). The Second Circuit weighs five factors in assessing the propriety of an award of attorneys' fees: (1) the degree of the offending party's culpability or bad faith; (2) the ability of the offending party to satisfy an award of attorney's fees; (3) whether an award of fees would deter other persons from acting similarly under like circumstances; (4) the relative

merits of the parties' positions; and (5) whether the action conferred a common benefit on a group of pension plan participants. <u>Salovaara v. Eckert</u>, 222 F.3d at 27-28.

In this case a determination of whether to award attorneys' fees rests on the first factor. Plaintiffs point to the same reasons as cited above to illustrate that the defendant has acted in bad faith. Defendant responds by stating that these characterizations are misleading and noting the "bad faith" conduct of plaintiffs both before and after their termination. Defendant states that prior to their termination, plaintiffs' misconduct included numerous acts of insubordination, overt efforts to sow dissent within defendant's administration, and the suspected defalcation of $10,000 earmarked for the school. Also, defendant alleges that after termination, plaintiffs engaged in a campaign of harassment and assault against Corhan and the Academy. Defendants states that the bad faith on the part of plaintiffs "should nullify any award of attorney's fees." Opp. to Pls.' Cross-Mot. for Summ. J. at 11-12 (citing <u>Lurzer v. American Showcase, Inc.</u>, 75 F. Supp. 2d 98, 103 (S.D.N.Y. 1998) (denial of attorney's fee award based on the culpability of the requesting party)). As a side note, defendant states that the "Wobblies" have shown an interest in hurting the Academy financially and thus an award of attorney's fees to the alleged "Wobblies" "is inappropriate and wholly unwarranted." Opp. to

Pls.' Cross-Mot. for Summ. J. at 12.

Although plaintiffs assert that termination of mediation is proof of defendant's bad faith, it is understandable that Adelphi would be reluctant to mediate with persons they suspect of assaulting one of their employees, even if those suspicions are found to be untrue. Even assuming that Adelphi terminated plaintiffs' employment solely because it wanted to protect Corhan, which defendant denies, its actions during the litigation process have demonstrated good faith (e.g., delivering COBRA notices and payment of back premiums) and therefore, this factor weighs against an award of attorney's fees. Thus, although plaintiffs appear to have a case that they were wrongfully terminated, the record is not so clear on this point that it would justify a finding of bad faith against defendant. Moreover, any such finding would be particularly inappropriate in light of defendant's good faith conduct during the course of litigation.

The remaining factors do not weigh heavily in favor of either party. The ability of Adelphi to pay attorney's fees is questionable. Plaintiffs state that "there is no doubt that defendant will be able to satisfy an award of attorney's fees and costs in this case, especially in the light of the fact that there has been no discovery in this matter yet." However, defendant alleges that the financial status of the school is

increasingly in jeopardy and that their insurance carrier will not cover statutory fines and penalties.

Third, plaintiffs have emphasized that there is a "strong deterrent reason" to award attorney's fees. Pls' Mot. for Summ. J. at 17. However, defendant has steadfastly asserted that plaintiffs were terminated for their own "gross misconduct," claiming that it had a legitimate reason for denying COBRA notices to these particular employees. Although deterrence of other employers should be taken into consideration, it is not good faith denial of notices that should be deterred, but those failures that have happened in bad faith. The goal of deterrence is not to compel employers who believe that their former employees have committed gross misconduct to provide COBRA notices solely out of fear of large penalties.

Fourth, plaintiffs point to the undisputed facts to judge the merits of their position against that of defendant. Pls' Mot. for Summ. J. at 17. Although defendant concedes that it did not provide the COBRA notices in a timely fashion, the fact remains that once litigation commenced defendant promptly rectified any alleged injury. Plaintiffs appear to be using COBRA's provision for statutory damages and attorneys' fees as a vehicle for punishing defendant for terminating them rather than out of a legitimate need for compensation for delinquent COBRA notices. Additionally, although not proven, circumstantial

evidence points to plaintiffs for being responsible for the harassment against Corhan. In particular, whoever painted the words "Tell it to the Judge" in Corhan's hallway the day after this court denied defendant's motion for a preliminary injunction to stop the harassment against Corhan was more likely than not to have learned of the court's involvement from one of the plaintiffs or their associates. This adds to the merits of defendant's position.

Finally, plaintiffs contend that an award of attorneys' fees and costs will benefit them as a group. Pls' Mot. for Summ. J. at 17. However, as defendant notes, plaintiffs do not (and do not purport to) represent the entire group of plan participants.

Because defendant has limited culpability with respect to the COBRA notices and has acted in good faith during this litigation, the plaintiffs' request for attorneys' fees and costs is denied.


### (3)

### State Law Claims

A federal court's exercise of supplemental jurisdiction is governed by 28 U.S.C. § 1367 (2000). Because the federal COBRA claim has been disposed of, the analysis is limited to whether the court should retain supplemental jurisdiction in the absence of any federal claim.

28 U.S.C. § 1367(a) provides that "in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a). The exercise of supplemental jurisdiction is permissive rather than mandatory. Valencia v. Lee, 316 F.3d 299, 305 (2d Cir. 2003) (citing Marcus v. AT&T Corp., 138 F.3d 46, 57 (2d Cir. 1998); Nowack v. Ironworkers Local 6 Pension Fund, 81 F.3d 1182, 1187 (2d Cir. 1996)). A district court may decline to exercise supplemental jurisdiction over a claim arising under § 1367(a) if (1) the claim raises a novel or complex issue of state law; (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction; (3) the district court has dismissed all claims over which it has original jurisdiction; or (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction. 28 U.S.C. § 1367(c). See Itar-Tass Russian News Agency v. Russian Kurier, Inc., 140 F.3d 442, 448 (2d Cir. 1998) (emphasizing that discretionary rejection of supplemental jurisdiction is proper "only if founded upon an enumerated category of subsection 1367(c).").

A federal court's determination of state law claims may "conflict with the principle of comity to States and with the promotion of justice between the parties." <u>Valencia</u>, 316 F.3d at 305 (quoting <u>Carnegie-Mellon University v. Cohill</u>, 484 U.S. 343, 349-50 (1988)).

> Thus, in the usual case in which all federal claims
> are eliminated before trial, the balance of factors
> to be considered under the pendant jurisdiction
> doctrine - judicial economy, convenience, fairness,
> and comity - will point toward declining to exercise
> jurisdiction over the remaining state law claims.

<u>Id.</u> (quoting <u>Carnegie-Mellon University</u>, 484 U.S. at 350 n.7 (1988)). Thus, "as a general proposition, . . . 'if all federal claims are dismissed before trial. . . the state claims should be dismissed as well.'" <u>Motorola Credit Corp. v. Uzan</u>, 388 F.3d 39, 56 (2d Cir. 2004) (quoting <u>Castellano v. Bd. of Trustees</u>, 937 F.2d 752, 758 (2d Cir. 1991)); <u>see also</u>, <u>Coyle v. Coyle,</u> 354 F. Supp. 2d 207, 214 (E.D.N.Y. 2005) (declining to exercise supplemental jurisdiction over state law assault, battery and malicious prosecution charges where federal claims have been dismissed in their entirety); <u>Garay v. U.S. Bancorp.</u>, 303 F. Supp. 2d 299, 303 (E.D.N.Y. 2004) (declining to exercise supplemental jurisdiction when all federal claims were disposed of early in the proceedings and before trial).

However, this is not "a mandatory rule." <u>In re Merrill Lynch Ltd. P'ships Litig.</u>, 154 F.3d 56, 61 (2d Cir. 1998); <u>Mauro v. Southern New England Telecomms., Inc</u>, 208 F.3d 384, 388 (2d

Cir. 2000) (exercising supplemental jurisdiction over a breach of contract claim after dismissing the federal claim was not an abuse of discretion because "those causes of action [did not] require the district court to resolve any novel or unsettled issues of state law."). Plaintiffs correctly assert that the court is not required to dismiss the claims simply because there is no longer a federal claim to be decided. Pls' Mot. For Summ. J. at 21 (citing 28 U.S.C. § 1367(c)); Itar-Tass, 140 F.3d at 446; Hutchinson v. United States of Am., No. 01 CV 1198, 2004 WL 350576, at *3 (E.D.N.Y. Feb. 20, 2004).

Specifically, the Second Circuit has stated that when "the dismissal of the federal claim occurs 'late in the action, after there has been substantial expenditure in time, effort, and money in preparing the dependent claims, knocking them down with a belated rejection of supplemental jurisdiction may not be fair." Motorola Credit Corp., 388 F.3d at 56 (retaining jurisdiction even after federal claims have been disposed of because of "significant (and probably non-duplicable) judicial resources that the District Court expended to evaluate the enormous record, to craft findings of fact, and to impose remedies") (internal quotations omitted); see also Nowack, 81 F.3d at 1192 (retaining jurisdiction over state claims after the federal claim was dismissed because the dismissal of the federal claim occurred just nine days before trial); Ametex Fabrics, Inc. v. Just In

Materials, Inc., 140 F.3d 101, 105-6 (2d Cir. 1998) (holding that it was proper for a district court to retain jurisdiction after discovery and a settlement conference had taken place).  These cases are distinguishable from the present action because here the parties are still in the "preliminary stages" and "have engaged in no discovery whatsoever."  Opp. to Pls.' Cross-Mot. for Summ. J. at 16.

Plaintiffs briefly assert that fairness "requires" the court's exercise of supplemental jurisdiction in this instance because to not do so would allow the defendant to succeed "in frustrating plaintiffs' efforts to resolve all matters in one action and will have, in effect, profited by its own bad conduct."  Pls' Mot. for Summ. J. at 22.  In respect to considerations of fairness, however, it is important to note that the plaintiffs will not be barred from relitigating their state law claims in state court on grounds that the statute of limitations has expired.  See N.Y. C.P.L.R. § 205(a) (McKinney 2004).

Considerations of judicial efficiency and fairness advise against retaining supplemental jurisdiction over the state claims after having disposed of the COBRA claim.  Accordingly, having disposed of the federal question raised by plaintiffs, this court will not exercise supplemental jurisdiction over the remaining state law claims, as those issues are more properly adjudicated

by the state court.

## Conclusion

For the foregoing reasons, the motion by plaintiffs for summary judgment is granted, without award of attorneys' fees or statutory damages.  Plaintiffs shall provide any additional itemized medical bills for determination of appropriate reimbursement within thirty days of this order.  Defendant's motion to dismiss the three state law claims for lack of jurisdiction is granted and those claims are dismissed without prejudice.


Dated: Brooklyn, New York
       September 29, 2006

                                   SO ORDERED:


                                   ____/s/_____
                                   David G. Trager
                                   United States District Judge